624 P.2d 1295

Joseph T. FLIEGER and Gussie Flieger, his wife,
Plaintiffs/Appellees/Cross-Appellants,

v.

Anthony T. ASH,
Defendant/Appellant/Cross-Appellee.

No. 2 CA–CIV 3491.

Court of Appeals of Arizona,
Division 2.

Dec. 10, 1980.

Rehearing Denied Feb. 4, 1981.

Review Denied March 10, 1981.

**248**

Miller, Pitt & Feldman, P. C. by Richard L. McAnally and Robert A. Fortuno, Tucson, and Harper & O'Neil, Casa Grande, for plaintiffs/appellees/cross-appellants.

Ash, Reeb & Addington by Fred J. Ash and Cecil P. Ash, Mesa, for defendant/appellant/cross-appellee.

## OPINION

RICHMOND, Judge.

This is an appeal by defendant Anthony T. Ash from a summary judgment foreclosing a mortgage and an order denying his motion for new trial on the issue of damages on his counterclaim for conversion of personal property. He also attacks the denial of his request for a jury trial on the issue of attorney's fees for the plaintiffs. Plaintiffs Joseph T. Flieger and Gussie Flieger, his wife, by cross-appeal challenge the sufficiency of the evidence to support the judgment awarding compensatory and punitive damages to Ash on his counterclaim and the manner in which their judgment on the complaint was offset by the judgment on the counterclaim. The judgment of foreclosure is affirmed, except for the award of attorney's fees. The judgment on the counterclaim is reversed.

On or about November 12, 1971, the parties entered into a written agreement for the Fliegers to sell and Ash to buy:

All right, title, and interest in and to approximately 320 acres of deeded land and approximately 16 sections [10,240 acres] of grazing land leased by Sellers from the State of Arizona, the Bureau of Land Management, and the San Carlos Indians, which comprises Sellers' ranch adjoining the Aravaipa Creek.

Additionally the Fliegers agreed to transfer:

all improvements located on the deeded and grazing land as well as all water rights, wells, pumps, and farming equipment used in the operation of said ranch and appurtenant thereto.

The Fliegers also agreed:

to execute a good and valid deed to the property with title insurance on the patented land and improvements, and . . . to sign all papers necessary to consummate sale.

The agreed purchase price was $300,000, payable $75,000 in cash and the remainder in annual installments of $45,000 plus interest at 5½ per cent per annum. The unpaid balance was to be evidenced by a promissory note secured by mortgage on the deeded land and grazing leases. Thereafter the Fliegers declined to perform and Ash commenced an action for specific performance. A judgment entered March 20, 1973, ordered the parties to perform the agreement and further provided:

[I]n the event said Defendants [the Fliegers] shall fail, neglect, refuse to make, execute, acknowledge, and deliver to the plaintiff [Ash] such deed, [to the 320 acres], assignments of grazing leases [to the 16 sections] and bill of sale of personal property and other documents [necessary to consummate the sale] within the time hereinbefore fixed [30 days after the entry of judgment], then, and in that case, this judgment shall stand and be a good, sufficient and complete conveyance, assignment and bill of sale from the defendants . . . to the plaintiff . . . of all the right, title and estate of said defendants in and to said real property and personal property set forth herein and shall be taken and held as good, complete and perfect deeds and documents of conveyance and transfer as would be the deeds and documents of conveyance and transfer hereinbefore specified . . .

On May 21, 1973, the Fliegers executed a warranty deed ostensibly conveying to Ash the deeded land and transferring all im-

provements located on the deeded and grazing lands, water rights, wells, pumps, and farming equipment used in the operation of the ranch. On June 20, Ash paid Flieger $75,000 and executed a promissory note for $225,000 payable as agreed. On the same day, Ash recorded the deed and a realty mortgage on the ranch. Both the mortgage and deed contained the following recital in the description of the deeded land:

> Parcel No. 3: That part of the SW ¼ NW ¼ of Section 24, T.6S., R. 17 E., more particularly described as follows:
>
> Point of beginning being 425 east from the NW corner of the SW ¼ NW ¼ of Section 24; thence running east 230 feet; Thence south 450 feet; thence northwesterly to the P.O.B. Together with water rights to Aravaipa Creek. Adjust to reflect trade of real property with Fred and Clifford Wood.

The trade with Fred and Clifford Wood referred to in the description had occurred in 1961 and involved conveyance of 77 acres from the Fliegers in exchange for 160 acres.

Ash took possession of the ranch in August 1973. On June 18, 1974, two days before the first payment on the promissory note was due, Ash by letter refused to make any payment on the note until a supplemental deed was executed because of the omission from the original deed of the 160-acre parcel conveyed to the Fliegers by the Woods in 1961. The letter also stated that Ash was entitled to the return of certain documents relating to water rights before he made any payment and claimed an offset of $12,506 for personal property removed from the ranch by the Fliegers. On June 24 the Fliegers responded by letter from their attorney informing Ash that legal action for foreclosure of the mortgage would be commenced if payment was not received within 10 days. Four days later the Fliegers' attorney by letter informed Ash that the entire balance of $225,000 had been accelerated under the terms of the mortgage.[1]

In November Ash tendered the 1974 payment less $12,506 for the personal property the Fliegers had removed, conditioned upon execution of a supplemental deed. The Fliegers rejected the tender and filed this foreclosure action on December 18, 1974. With his answer raising affirmative defenses of equitable estoppel and failure of consideration, Ash filed a counterclaim for compensatory and punitive damages for fraudulent misrepresentations and conversion of personal property.

During the pendency of this action Ash initiated an order to show cause proceeding in the previous specific performance action. The trial judge in that case, by order dated December 16, 1976, refused to find that the Fliegers were in contempt of court but ordered them within 30 days to execute and deliver to Ash a deed to the 160 acres from the Wood exchange and to provide Ash with title insurance thereon. Ash was ordered to execute, simultaneously with delivery of the deed and receipt of title insurance, a mortgage on the 160 acres as additional security for the 1973 promissory note. The judge ordered the Fliegers to execute and deliver to Ash an assignment of their rights in leases from the San Carlos Apache Indians, but found that many items of personal property removed by the Fliegers and the documents requested by Ash were not within the original agreement of sale. He also found that failure to deliver possession of certain fixtures constituted a breach of the contract for which an action for damages would lie but that no such relief could be granted in the proceedings before him.

On October 17, 1977, the supplemental deed was recorded and a title insurance policy on the 160 acres was issued. With a letter dated January 11, 1978, Ash's attorneys tendered $229,500 representing the first four annual payments of principal and interest on the note and mortgage. The tender was rejected on January 13. Ash then filed a motion for summary judgment, which was opposed in part on the grounds that the mortgage had been accelerated and all five payments were due, together with

---

1. Ash has not challenged the attempt to accelerate within the 10 days extended by the June 24 letter so we need not decide whether it was premature.

attorney's fees and court costs. The motion was denied. Next, the Fliegers filed motions in limine to exclude evidence at trial concerning conversion of the personal property and documents and the omission of 160 acres from the original deed.

On April 5, 1978, the trial judge found that the original deed was sufficient to convey 320 acres, preventing Ash from claiming the omission of 160 acres as a defense to the foreclosure action, and that the 1973 judgment for specific performance was a sufficient conveyance of the Fliegers' title to the real property. He also granted the motion to exclude evidence in support of the claimed damages of $12,506 for conversion of personal property and evidence on the claim by Ash for conversion of the documents. Two days later the Fliegers filed a motion for summary judgment on the complaint for foreclosure. On May 16, at the commencement of the jury trial, the court granted the Fliegers' motion, reserving "all attorney's fees matters" for decision by the court. The counterclaim proceeded to trial before a jury, which returned a verdict in favor of Ash in the sum of $59,000 compensatory damages and $4,600 punitive damages. After a delay of several months, resulting in part from the illness of the trial judge, Ash's motion for a jury trial on the Fliegers' petition for attorney's fees and both parties' motions for new trial were denied. Ultimately, following an evidentiary hearing before the court, the Fliegers were awarded attorney's fees of $23,000 and Ash was awarded attorney's fees of $6,300.[2] An amended judgment of foreclosure, offsetting the judgment in favor of Ash on the counterclaim, was entered.

■ We do not agree with the trial court's finding that either the original deed or the 1973 judgment for specific performance was sufficient to satisfy the Fliegers' obligation "to execute a good and valid deed to the property with title insurance on

the patented land and improvements." The Fliegers argue, however, that a buyer in possession is limited to rescission or an action for damages for the seller's breach of the parties' agreement and can withhold payment only at the risk of acceleration of the mortgage debt. *Cf. McMillan v. Golden*, 261 Or. 554, 495 P.2d 720 (1972) (purchaser under contract for sale could not retain possession and refuse to make annual payments because of seller's failure to pay rent). We agree.

Ash at all times elected to affirm the agreement. Having done so, he could not remain in possession of the ranch and refuse to make the annual payment on the note and mortgage. *See* Restatement of the Contracts, § 309, illustration 1 (1932). His remedies, both of which he subsequently pursued, were enforcement of the judgment in the specific performance action or the claim for damages he asserted in his counterclaim.

Nevertheless, Ash maintains the Fliegers' failure to deliver the deed and title insurance on the omitted 160 acres for more than three additional years, including 10 months after being ordered to do so in the specific performance action, at least raises a genuine issue of material fact whether they acted in good faith entitling them to the equitable relief of mortgage foreclosure. *See Arizona Coffee Shops v. Phoenix Downtown Park Association*, 95 Ariz. 98, 387 P.2d 801 (1963).

In *Arizona Coffee Shops* the mortgagee allegedly conducted itself so as to prevent the mortgagor from realizing that an interest payment was overdue. In contrast, the Fliegers insisted on timely payment. Their delay in delivering the deed and title insurance after acceleration does not create a material issue on their right to foreclosure.

■ The Fliegers' contention that Ash's request for a jury trial on the issue of

---

**2.** Both parties originally challenged the award of attorney's fees on the counterclaim, Ash arguing it was inadequate and the Fliegers contending no award was authorized under A.R.S. § 12–341.01 because the counterclaim was filed

before the effective date of the statute. At oral argument Ash's counsel conceded that any award was improper. *See Bouldin v. Turek*, 125 Ariz. 77, 607 P.2d 954 (1979).

attorney's fees was waived by his failure to urge it in opposition to the motion for summary judgment is refuted by Ash's counsel's argument on the motion and the renewed request in response to the Fliegers' post-trial petition for attorney's fees. The Fliegers' other argument that submission of the issue in an equitable proceeding would be useless is unsupported by authority. The nature of the issue to be tried rather than the character of the overall action determines the right to a jury trial. *Cf. Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) (upholding Seventh Amendment right to jury trial on corporation's legal claims despite historically equitable nature of stockholder's derivative suit). Though there are problems commending the stipulated submission of the issue to the court,[3] the right to a jury trial on reasonable attorney's fees where they are not awarded as part of a statutory remedy has long been recognized. *See Smith v. Goode*, 29 Ga. 185 (1859). Ash's request should have been granted.

■ We believe the trial court also erred in granting the Fliegers' motion to exclude any evidence in support of Ash's claim for damages in the amount of $12,506 resulting from the conversion of certain personal property, and his claim that he is entitled to certain documents described in the counterclaim. The only ground advanced by the Fliegers in the trial court or on appeal is that the ruling on the 1976 order to show cause in the specific performance action precluded admission of any evidence on those claims under the doctrine of collateral estoppel. Despite the identity of the parties and the issues, the 1976 order was not a final judgment subject to appeal and the doctrine has no application. *See O'Neil v. Martin*, 66 Ariz. 78, 182 P.2d 939 (1947); *Moore Drug Co. v. Schaneman*, 10 Ariz.App. 587, 461 P.2d 95 (1969). Judgment on the counterclaim therefore is reversed, disposing of the issues on the cross-appeal.

3. For a discussion of those problems, *see Davis v. Naviera. Aznar S. A.*, 37 F.R.D. 223 (D.Md. 1965).

The case is remanded for further proceedings, the parties to bear their own costs on appeal.

HATHAWAY, C. J., and HOWARD, J., concur.